UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| WTEC ENERGY,<br><br>    Plaintiff,<br>v.<br><br>TS CONDUCTOR CORPORATION and JASON HUANG,<br><br>    Defendants. | Civil Action No. 24-5810 (JXN) (AME)<br><br>OPINION |

**NEALS**, District Judge:

  This matter comes before the Court on Defendants TS Conductor Corporation and Jason Huang's ("Defendants") motion to dismiss Plaintiff WTEC Energy's ("WTEC" or "Plaintiff") Complaint (ECF No. 1) pursuant to pursuant to Federal Rule of Civil Procedure 12(b)(6). (ECF No. 22). Jurisdiction is proper pursuant to 28 U.S.C. § 1332. Venue is proper pursuant to 28 U.S.C. § 1441. The Court has carefully considered the parties' submissions and decides this matter without oral argument pursuant to Federal Rule of Civil Procedure 78(b) and Local Civil Rule 78.1(b). For the reasons set forth below, Defendants' motion to dismiss is **DENIED.**

### I. BACKGROUND AND PROCEDURAL HISTORY[1]

  WTEC brings this action against Defendants for violation of an alleged oral joint venture agreement entered into by the parties to collaborate on a new process for stranding of high-voltage electrical cables. "Stranding" is a manufacturing process that involves wrapping strands of conductive wire around a steel "core" to create an "overhead conductor," more commonly known as an electrical "power line." (Compl. ¶¶ 3, 6).

---

[1] The following factual allegations are taken from the Complaint, which are accepted as true. *Sheridan v. NGK Metals Corp.*, 609 F.3d 239, 262 n.27 (3d Cir. 2010).

Power lines are critical to day-to-day life as demonstrated from telephone pole to telephone pole across the country. (*Id.* at ¶ 3). "The conductor consists of two main components: core and stranded wire." (*Id.*). "Core is the strength member at the center of the conductor. The core allows electrical wire to be hung from pole to pole without breaking. Stranded wire is the thin aluminum strands of conductive wire that are wrapped or 'stranded' around the core and provide the electrical conductivity." (*Id.*).

According to the Complaint, WTEC is "an industry leader" in stranding. (*Id.*). Defendant Jason Huang ("Huang") is an inventor and entrepreneur who, together with his brother, owns the rights to commercialize a new type of core made from carbon fiber instead of steel, referred to as the "TS Core." (*Id.* ¶¶ 2, 4, 24). Defendant TS Conductor Corporation was formed to commercialize the TS Core. (*Id.* ¶ 71).

In approximately 2017, Defendants began manufacturing the TS Core in China. (Compl. ¶ 27). In or around March 2018, WTEC CEO Brian Singh met Huang at WTEC's corporate offices in New Jersey through Vivek Kohli, a WTEC consultant and longtime friend of Huang. (*Id.* ¶ 28).

WTEC recognized that (1) the TS Core itself needed to be manufactured in the United States, and Defendants would need capital to construct that facility which could be obtained through investor introductions by WTEC; (2) as a new and, indeed, novel component, the carbon fiber TS Core and TS Conductor product would need to be introduced, explained, and marketed to relevant industry players, which WTEC could facilitate using its credibility and network of connections; and (3) the TS Core and TS Conductor product would need to be tested by accredited North American laboratories in order to be accepted for use in the industry, which WTEC could facilitate using its longstanding contacts with these testing entities. (*Id.* ¶¶ 33-38). According to the Complaint, the parties agreed and presented themselves to third parties as joint ventures. (*Id.*

2

¶¶ 29, 30, 41, 42, 46). However, when WTEC sought to memorialize at least the exclusivity component of the parties' ongoing relationship, Huang refused. (*Id.* ¶ 65).

In 2018, in connection with WTEC's efforts in marketing the TS Core product to investors and utilities, WTEC undertook a significant expansion of its Pensacola, FL manufacturing and warehousing facility. (*Id.* ¶ 52). Specifically, WTEC constructed a new, 100,000 square foot stranding facility at the Pensacola site. (*Id.* ¶ 53). WTEC constructed this stranding facility, which cost approximately three $3 million, in reliance on its understanding, based on Huang's representations that it would serve as the exclusive strander of the TS Core. (*Id.* ¶¶ 54-55).

Huang "would frequently travel to China for one to two months at a time to tend to his China-based operations, leaving the U.S. sales and marketing of the TS Core and TS Conductor product" to WTEC. (*Id.* ¶ 56). As interest in the TS Conductor product increased, WTEC retained sales agency Preferred Sales Inc., to market the TS Conductor. (*Id.* ¶¶ 56-57).

In or around mid-2019, WTEC agreed to fund industry specific testing by an accredited testing entity which cost WTEC approximately $350,000. (*Id.* ¶ 60, 63).

Subsequently, WTEC discussed with Huang its desire to memorialize the parties' relationship in a written Exclusive Strander Agreement. (*Id.* ¶ 64). However, Huang indicated that he could not sign the Exclusive Strander Agreement—citing the ongoing litigation between Huang and his former employer CTC Global over the intellectual property rights to the TS Core—but that he remained committed to an exclusive strander relationship with WTEC regarding the TS Core and TS Conductor product. (*Id.* ¶ 65). Thereafter, Defendants successfully raised capital from investors introduced to them by WTEC and then repudiated the parties' relationship completely, leading WTEC to institute this action. (*Id.* ¶¶ 71-76).

On May 2, 2024, WTEC filed its Complaint alleging breach of an oral contract (Count

3

One); breach of an implied in fact contract (Count Two); breach of an implied in law contract (Count Three); breach of an implied joint venture agreement (Count Four); and breach of fiduciary duty of co-venturers (Count Five). (ECF No. 1).

On July 12, 2024, Defendants filed the instant motion to dismiss. ("Defs.' Br.") (ECF No. 22). On August 16, 2024, Plaintiff opposed. ("Pl.'s Br.") (ECF No. 25). On August 27, 2024, Defendants replied. ("Defs.' Rep. Br.") (ECF No. 26). This matter is now ripe for consideration.

## II. LEGAL STANDARD

Rule 8 requires that a pleading include "a short and plain statement of the claim showing that the pleader is entitled to relief" and provide the defendant with "fair notice of what the claim is and the grounds upon which it rests[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation and internal quotations and ellipses omitted). On a Rule 12(b)(6) motion, the "facts alleged must be taken as true" and dismissal is not appropriate where "it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (citation omitted). A complaint will survive a motion to dismiss if it provides a sufficient factual basis to state a facially plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

To determine whether a complaint is sufficient, the Third Circuit requires a three-part inquiry: (1) the court must first recite the elements that must be pled in order to state a claim; (2) the court must then determine which allegations in the complaint are merely conclusory and therefore need not be given an assumption of truth; and (3) the court must "assume the[] veracity" of well-pleaded factual allegations and ascertain whether they plausibly "give rise to an entitlement for relief." *Santiago v. Warminster Twp.,* 629 F.3d 121, 130 (3d Cir. 2010) (citations omitted).

## III. DISCUSSION

4

Defendants move to dismiss Plaintiff's Complaint on three grounds: (1) the alleged joint venture is unenforceable because the transactions at issue are governed by the Uniform Commercial Code ("UCC"), which requires any agreement(s) worth more than $500.00 to be in writing; (2) Plaintiff's contract claims are time-barred under the UCC's four year statute of limitations; and (3) Plaintiff's assertion of a joint venture lacks any factual basis in the Complaint because Plaintiff fails to allege how the parties had mutual control, had a joint property interest, or had an agreement to share in any profits and losses.

Plaintiff contends that WTEC has alleged an enforceable, common-law contract for a comprehensive joint venture towards the commercial success of the TS Conductor product, of which one component, of many, was an "exclusive stranding" agreement between the parties. As such, under the common law, the statute of limitations is six years.

### A. Common Law Applies and WTEC Sufficiently Alleges a Joint Venture Agreement

The parties dispute which statute of limitations is applicable and when the claim accrued. (Defs.' Br. at 2, 13-14; Pl.'s Br. at 17).

To determine the applicable statute of limitations, the Court must first analyze whether the contract is governed by the UCC or the common law. "There are two different types of contract claims, those based in the general common law of contracts and those based on the Uniform Commercial Code, which governs contracts for the sale of goods." *MRL Dev. I, LLC v. Whitecap Inv. Corp.*, No. 13-0048, 2014 WL 6461583, at *17 (D.V.I. Nov. 18, 2014).

The UCC, codified at N.J.S.A. § 12A:1-101 *et seq.*, applies to contracts for "goods," but not to contracts for services. *Quality Guaranteed Roofing, Inc. v. Hoffmann-La Roche, Inc.*, 694 A.2d 1077, 1078 (N.J. Super. Ct. App. Div. 1997). The UCC defines a good as "all things which are movable at the time of identification to the contract for sale . . . ." N.J.S.A. § 12A:2-105.

5

When a contract is for goods and services, a court must determine which aspect of the contract, the goods or the services, predominates. *Paramount Aviation Corp. v. Agusta*, 288 F.3d 67, 72 (3d Cir. 2002) (citation omitted); *Conopco, Inc. v. McCreadie*, 826 F. Supp. 855, 867 (D.N.J. 1993). In making this determination, a court must examine the whole transaction and look to the essence or main objective of the parties' agreement. *Paramount Aviation Corp.*, 288 F.3d at 72 (citing *Tele–Radio Sys. Ltd. v. De Forest Elec.*, 92 F.R.D. 371, 374 (D.N.J. 1981)). "[C]ourts look to the language and circumstances surrounding the contract, the relationship between the goods and services, the compensation structure and the intrinsic worth of the goods provided." *Id.* (citation omitted) (alteration in the original).

New Jersey defines a joint venture as:

> '[a] special combination of two or more persons where in some specific venture, a profit is jointly sought without any actual partnership or corporate designation.' *Wittner v. Metzger*, 72 N.J. Super. 438, 444 (App. Div.) (quoting *Kurth v. Maier*, 133 N.J. Eq. 388, 391 (E. & A. 1943)). It is 'an undertaking usually in a single instance to engage in a transaction of profit where the parties agree to share profits and losses.' *Id.* For a joint venture to have been formed, the parties must have agreed upon the essential terms. A joint venture agreement does not exist if the terms are 'so vague, indefinite and uncertain as to make it illusory and therefore unenforceable.' *Paley v. Barton Sav. & Loan Ass'n*, 82 N.J. Super. 75, 82 (App. Div.), *certif. denied*, 41 N.J. 602 (1964). In determining whether a joint venture was formed, the court's primary consideration is the intention of the parties. *Weichert Co. Realtors v. Ryan*, 128 N.J. 427, 435 (1992).

*Burnham v. WMC Mortg. Corp.*, No. 07-6101, 2010 WL 2560657, at *7 (D.N.J. June 21, 2010) (quoting *Ginsberg v. Bistricer*, 2007 WL 987169, at *11 (App. Div. Apr. 4, 2007)); *see also Lo Bosco v. Kure Engineering Ltd.*, 891 F. Supp. 1020, 1026 (D.N.J. 1995) ("A joint venture is predicated on the same legal event as an employment, partnership, contract or other relationship: an agreement between the parties."); *id.* at 1027 ("[T]he joint venture relationship may be less

6

formal" and "may be implied wholly or in part from the acts and conduct of the parties."); *Streamline Bus. Servs., LLC v. Vidible, Inc.*, 2015 WL 3477675, at *6 (E.D. Pa. June 2, 2015) ("A joint venture resembles a jellyfish—they each have changing forms, they can wander a great deal, they have an unsettled future, and a backbone is not necessary.").

To sufficiently plead the existence of a joint venture generally requires some or all the following elements:

> (A) A contribution by the parties of money, property, effort, knowledge, skill or other asset to a common undertaking;
>
> (B) A joint property interest in the subject matter of the venture;
>
> (C) A right of mutual control or management of the enterprise;
>
> (D) Expectation of profit, or the presence of adventure, as it is sometimes called;
>
> (E) A right to participate in the profits;
>
> (F) Most usually, limitation of the objective to a single undertaking or ad hoc enterprise.

*Burnham*, 2010 WL 2560657, at *7.

Here, the parties' intent, based on the allegations, was broader than the production and sale of goods and therefore beyond the UCC. Plaintiff's Complaint alleges, *inter alia*, that the parties agreed:

- WTEC would leverage its capital, "industry expertise," "credibility," and "connections" to introduce the novel TS Core and TS Conductor product to North American utility companies, construction firms, and potential investors, which culminated in WTEC's hiring of nationally recognized marketing firm Preferred Sales Inc. to market the TS Conductor product. (Compl. ¶¶ 5, 28, 29, 57-58).

- Huang would seek additional equity funding to build a U.S.-based core manufacturing facility, given the importance of manufacturing the product in the United States (*Id.* ¶ 29).

- WTEC would provide substantial up-front capital to develop, test, launch, and

- market both the TS Core and TS Conductor product. (*Id.* ¶¶ 5, 29).

- WTEC would use its capital and contacts to facilitate the required testing of the TS Core by accredited laboratories (*Id.* ¶¶ 37, 60-63).

- Huang and WTEC to personally market the TS Core to potential investors in an effort to raise additional capital (*Id.* ¶ 36).

- Huang and WTEC to work together to develop and secure customers and Purchase Orders for the finished TS Conductor product and use that capital to manufacture the TS Core in the United States (*Id.* ¶¶ 35, 39-49).

- WTEC to utilize its capital and existing and newly constructed manufacturing infrastructure to produce the finished TS Conductor product (*Id.* ¶ 5).

- WTEC and Huang represented their relationship to numerous utilities, construction companies, and investors throughout North America within WTEC's extensive network of customers and contacts at "pitch" meetings as a joint venture. (*Id.* ¶¶ 41-42).

These allegations, taken as true, plausibly plead a joint venture for which each parties' services predominates. *See*, *e.g.*, *Summit Transport Corporation v. Hess Energy Marketing, LLC*, No. 14-5119, 2015 WL 858153 (D.N.J. Feb. 27, 2015); Quality Guaranteed, 694 A.2d at 1077-79; *CMT Developer LLC v. Acier Holdings LLC*, No. 21-12517, 2023 WL 2263750, at *6 (D.N.J. Feb. 28, 2023); *Starland v. Fusari*, 2013 WL 12149123, at *6-7 (D.N.J. Nov. 15, 2013); *Nissen v. Rozsa*, 2011 WL 2517134, at *5-7 (D.N.J. June 23, 2011); *Streamline Bus. Servs., LLC v. Vidible, Inc.*, 2015 WL 3477675, at *5 (E.D. Pa. June 2, 2015) (finding a joint venture based on an "alleged oral contract between the parties, which is sufficient at this stage of the litigation").

Additionally, Plaintiff's allegations demonstrate that Defendants' TS Core component had comparatively minor "intrinsic worth" without the parties' other investments in and efforts towards its testing, marketing, and stranding as described in the Complaint. (Compl. ¶¶ 4, 27, 35, 60-63). *See Paramount Aviation Corp. v. Agusta*, 288 F.3d 67, 72 (3d Cir. 2002) (instructing courts to consider, among other factors, "the intrinsic worth of the goods provided" under the agreement).

Defendants rely on *Talon Industries, LLC v. Rolled Metal Products, Incorporated*, No. 15-4103, 2022 WL 3754800 (D.N.J. Aug. 30, 2022). However, *Talon Industries* is distinguishable. In *Talon Industries*, the contract at issue was for the one-time custom manufacture and sale of an industrial metal-cutting machine. *Talon Industries*, 2022 WL 3754800, at *2. Defendant Rolled Metal Products hired Talon Industries' predecessor to manufacture a machine for use in defendant's metalwork business. The contract required Talon Industries to manufacture and deliver the machine according to defendant's specifications, however "the terms of the agreement also cover[ed] related services, including designing, building, painting, and testing the machine before delivery, as well as start-up assistance and training." *Id.* at *4. On summary judgment, the court assessed the essential purpose of the parties' written sale contract and found the transaction in goods predominated because the contract was titled with respect to the machine, only, and the contract price equaled the cost of the machine, only, and did not account for any services. *Id.* at *5.

In *Talon Industries*, the contract contemplated an isolated, one-time sale and delivery. Conversely, here, WTEC has alleged an ongoing and multi-faceted commercial relationship. Additionally, unlike in *Talon Industries*, where the "ancillary services" of "designing, building, painting, and testing the machine before delivery" and "start-up assistance and training" were to be performed by the manufacturer only, here, WTEC has alleged a bilateral agreement requiring both parties to contribute various services and assets towards the commercial success of the TS Conductor product. (Compl. ¶¶ 5, 9, 28, 29, 35-38, 62, 76). Thus, *Talon Industries* is inapposite.[2]

---

[2] Likewise, the other cases Defendants cite are inapposite. *See Power Restoration International, Incorporated v. PepsiCo, Incorporated*, 2015 WL 1208128, at *11 (E.D. Pa. Mar. 17, 2015) (finding a contract for goods where the cost of goods constituted 86-90 percent of the total contract price, despite plaintiff urging that "specific [service-related] line items" (to be performed by the manufacturer only) represented a sufficient services component, the court looked to "the overall context of the [parties'] business relationship" to determine that their transaction was a sale of goods); *see also KSW Mechanical Services v. Johnson Controls, Incorporated*, 992 F. Supp. 2d 135, 141 (E.D.N.Y. 2014) (finding that the U.C.C. applied to a purchase order for the one-time manufacture and delivery of air

In contrast, *Summit Transport*, is on point. The *Summit Transport* Court denied Hess' motion to dismiss Summit's claims for breach of an oral joint venture agreement between the two oil companies. 2015 WL 858153, at *1 (D.N.J. Feb. 27, 2015). Summit Transport alleged that the parties entered into an oral joint venture agreement by which Summit Transport, based in New York City, hoped to secure a dependable supply of fuel oil from industry leader Hess, and Hess sought to raise its name recognition in the New York metropolitan market. *Id.* The parties agreed that Hess would service Summit Transport's NYC area accounts in its "distinctive branded trucks," while Summit Transport would "continue[] to develop and expand the customer base." *Id.* Throughout the parties' relationship, Hess had "avoided memorializing the joint venture in writing." *Id.* Despite a written memorialization of the agreement, the court held that the parties' bilateral exchange of strategic business advantages constituted an enforceable oral or implied joint venture. *Id.* Similarly, WTEC alleges it contributed certain strategic business advantages—namely its industry connections and reputation—as well as capital and individual time and effort, and that Huang would contribute his own time and efforts and the TS Core component.

## B. The Common Law Statute of Frauds Does Not Bar WTEC's Complaint

The parties' oral or implied joint venture agreement is enforceable without a writing. *See Hellenic Lines, Ltd. v. Commodities Bagging & Shipping, Process Supply Co., Inc.*, 611 F. Supp. 665, 679 (D.N.J. 1985) ("The *sine qua non* of a joint venture is a contract, express or implied."). Indeed, "the Court may not dismiss on those grounds unless it is clear from the face of the complaint or the documents attached thereto that the Statute of Frauds presents an insurmountable bar to plaintiff's cause of action." *Summit Transport Corp.*, 2015 WL 858153, at *5. As in *Summit*

---

conditioning units). Additionally, the Court notes that *Power Restoration* was a summary judgment opinion applying Pennsylvania law, which is further distinguishable because New Jersey courts "treat the question of whether goods or services predominate in a mixed goods and services contract as a question of fact," whereas "Pennsylvania courts . . . decide the issue as a matter of law." 2015 WL 1208128, at *9.

*Transport*, nothing in the Complaint suggests that the parties' joint venture could not have been fully performed or otherwise cancelled within a year of its formation. Notwithstanding, "whether [an] alleged joint venture agreement could be performed within one year is a question of fact inappropriate for resolution at the pleading stage." *Id.* (collecting cases). Moreover, "[c]ourts may decline to apply the Statute of Frauds where such application would itself accomplish a fraud and a party has received the full benefit of another party's performance." *Id.* Here, Plaintiff alleges Defendants have benefitted materially from WTEC's performance under the parties' joint venture agreement. (Compl. ¶¶ 76, 92). Thus, even if a statute of frauds did apply, given WTEC's allegations, the Court could exercise its equitable discretion not to invoke that doctrine.

### C. WTEC's Complaint is Timely

Having determined that the common law is applicable, the Complaint is timely under the common law statute of limitations. An action for recovery upon a contractual claim or liability must be commenced within six years. N.J.S.A. 2A:14-1.6. This includes actions on joint venture agreements. *See*, *e.g.*, *Paramus Realty v. G&A Builders, Inc.*, 2012 WL 75090, at *1 (N.J. App. Div. Jan. 11, 2012) (determining date on which six-year statute of limitation for breach of joint venture agreement began to run). WTEC has alleged a breach of the parties' joint venture agreement in or around February 2020. WTEC's Complaint was filed May 2, 2024, and thus, timely.

### D. WTEC's Breach of Fiduciary Duty Claim Survives

"There can be no question that joint venturers owe each other a fiduciary duty." *Lo Bosco*, 891 F. Supp. at 1033. The Court having found WTEC, at this juncture, has adequately plead a joint venture agreement, WTEC's breach of fiduciary duty claim, based on "one joint venturer profiting at the other's expense" survives. (Compl. ¶¶ 106-09). *Lo Bosco*, 891 F. Supp. at 1033.

11

**IV.   CONCLUSION**

For the reasons set forth above, Defendants' motion to dismiss (ECF No. 22) is **DENIED**.

An appropriate Order accompanies this Opinion.

DATED: June 30, 2025

_____
HONORABLE JULIEN XAVIER NEALS
United States District Judge