**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| WTEC ENERGY,<br><br>               Plaintiff,<br><br>     v.<br><br>TS CONDUCTOR CORP., *et al.*,<br><br>               Defendants. | Civil Action No. 24-5810 (JXN)(AME)<br><br><br>**OPINION** |

**NEALS**, District Judge

Before the Court is a motion to dismiss: (1) Defendants TS Conductor Corporation ("TSC") and Jason Huang's ("Huang") Counterclaim against Plaintiff WTEC Energy ("WTEC"); and (2) TSC's Third-Party Complaint against Third-Party Defendant Brian Singh ("Singh") (with WTEC, "WTEC Defendants"). (ECF No. 47.) Jurisdiction is proper pursuant to 28 U.S.C. § 1332. Venue is proper pursuant to 28 U.S.C. § 1441. The Court has carefully considered the parties' submissions and decides this matter without oral argument pursuant to Federal Rule of Civil Procedure[1] 78 and Local Civil Rule 78.1. For the reasons set forth below, the WTEC Defendants' motion to dismiss is **GRANTED**.

---

[1] "Rule" or "Rules" hereinafter refer to the Federal Rules of Civil Procedure.

I.    **BACKGROUND**[2]

    A.    **Statement of Facts**

Given the parties' familiarity with this case, the Court provides only the facts necessary to decide the present motion.[3] Unless otherwise indicated, the facts come from the Third-Party Complaint. (*See* Third-Party Compl., ECF No. 35.)

Huang founded TSC in 2019 to make and sell the TS Conductor, a new kind of transmission line.[4] (*Id*. ¶¶ 5, 7,11.) Most transmission lines have inefficient and heavy steel cores. (*Id*. ¶ 6.) The TS Conductor uses a lightweight carbon core (the TS Core) surrounded by an aluminum tube. (*Id*. ¶ 7.) "The core and tubing is then wrapped or 'stranded' with aluminum wire to make an 'overhead electrical conductor.'" (Compl. ¶ 2, ECF No. 1.)

While looking for potential investors in 2018, Huang met Singh, WTEC's CEO. (Third-Party Compl. ¶ 13.) At the time, WTEC exclusively made distribution lines.[5] (*Id*. ¶¶ 14–15.) But, according to TSC, Singh hoped to expand WTEC's business into other areas of electrical distribution. (*Id*. ¶ 16.) During this meeting, Singh allegedly offered to have WTEC serve as TSC's exclusive "strander." (*Id*.)

Huang orally agreed, subject to four conditions: (1) the WTEC Defendants would introduce Huang and TSC to prominent industry leaders; (2) WTEC would fund the TS Conductor's

---

[2] The following factual allegations are accepted as true for the purposes of deciding this motion. *Sheridan v. NGK Metals Corp.*, 609 F.3d 239, 262 n.27 (3d Cir. 2010).

[3] For a fuller recitation of the facts, please review the Court's June 30, 2025, Opinion on TSC's Motion to Dismiss. (Op., ECF No. 27.)

[4] Transmission lines carry high voltage electricity from power plants to substations. *See Electricity Explained*, U.S. Energy Info. Admin., https://www.eia.gov/energyexplained/electricity/delivery-to-consumers.php (last visited June 25, 2026).

[5] Distribution lines deliver low voltage electricity from substations to customers. *See Electricity Explained*, U.S. Energy Info. Admin., https://www.eia.gov/energyexplained/electricity/delivery-to-consumers.php (last visited June 25, 2026).

2

promotion and marketing; (3) WTEC would strand the TS Core "with quality and ensure that it would pass any required testing" and "build a new manufacturing facility or expand a current WTEC manufacturing facility with the equipment and capability to strand the TS Core"; and (4) TSC would receive "sufficient purchase orders for the TS Conductor from any of the potential customers introduced by [the WTEC Defendants]." (*Id.* ¶ 18.) TSC alleges Singh agreed to Huang's terms on WTEC's behalf. (*Id.* ¶ 19.)

The parties never reduced their agreement ("Oral Agreement") to writing. (*Id.* ¶ 20.) TSC, however, claims the parties understood that: (1) "WTEC would immediately start expanding its existing Florida manufacturing facility and obtain the proper equipment to enable it to strand the TS Core"; (2) WTEC's Florida facility would be "solely dedicated to the TS Core"; (3) WTEC's "compensation as a strander would be a concrete fee and not contingent on the price of the TS Conductor; and (4) "WTEC had the option to purchase the TS Core directly from TSC, strand the TS Core, and subsequently sell the complete TS Conductor on its own." (*Id.* ¶¶ 21–24.) TSC further asserts that the parties, at no point, intended to form a joint venture or partnership. (*Id.* ¶¶ 25–26.)

Over the next two years, TSC claims the WTEC Defendants fulfilled the first two conditions of the Oral Agreement: introductions to industry leaders and marketing the TS Conductor. (*Id.* ¶¶ 28–29.) During pitches to potential investors and customers, Huang explained that WTEC agreed to strand the TS Core and build a new manufacturing facility solely dedicated to stranding the TS Core. (*Id.* ¶ 33.) According to TSC, a WTEC executive present during pitches[6] assured "customers that WTEC would be ready and able to strand the TS Core upon receiving any purchase orders for the TS Conductor." (*Id.* ¶ 34.)

---

[6] WTEC Chief Commercial Officer Dave Frank.

But, in TSC's telling, the WTEC Defendants failed to satisfy the third condition of the Oral Agreement: strand the TS Cores, ensure the TS Cores passed testing, and build a facility to strand the TS Cores. WTEC's existing equipment could not make "annealed trapezoidal aluminum strands," but WTEC allegedly failed to buy the necessary equipment to do so. (*Id.* ¶ 39.) Because WTEC could not strand the TS Core, TSC imported stranded TS Conductor samples from China for testing. (*Id.* ¶ 40.) WTEC funded the testing, which the TS Conductor passed. (*Id.* ¶¶ 41–42.)

During the 2020 COVID-19 pandemic, "WTEC reduced its spending across the board," cut staff, and stopped marketing or promoting the TS Conductor. (*Id.* ¶ 44.) Huang apparently assumed the spending cuts would delay the "expansion of the WTEC Florida stranding facility." (*Id.* ¶ 45.) To his surprise, Huang learned WTEC never did any work to expand the Florida facility. (*Id.* ¶ 46.) Huang then asked Singh whether WTEC would be able to perform on the Oral Agreement. (*Id.* ¶ 48.) Singh replied that WTEC could not. (*Id.*)

TSC looked for other stranders, albeit unsuccessfully. (*Id.* ¶¶ 49, 59.) By late 2021, TSC raised $25 million from investors. (*Id.* ¶ 55.) TSC used those funds to build its own California manufacturing facility in 2023, where it makes and strands TS Cores in-house. (*Id.* ¶¶ 56, 59.) TSC then raised another $60 million in July 2024, which it used to open a South Carolina manufacturing facility in 2025. (*Id.* ¶¶ 62–63.) TSC claims it did not meet any of its investors through the WTEC Defendants. (*Id.* ¶¶ 55, 62.)

**B.     Procedural History**

On May 2, 2024, WTEC sued Huang and TSC for breach of the Oral Agreement, unjust enrichment, breach of an implied joint venture, and breach of fiduciary duty. (*See* Compl.) TSC and Huang moved to dismiss (*see* TSC Mot. to Dismiss, ECF No. 22), which the Court denied in

4

its entirety (*see* Op). Relevant here, the Court concluded that WTEC adequately alleged that a joint venture agreement existed between WTEC and TSC. (*Id.* at 5–10.)

TSC and Huang filed a Counterclaim against WTEC (*see* Countercl., ECF No. 34), and TSC filed a Third-Party Complaint against Singh. (*See* Third-Party Compl.) The Counterclaim includes claims for fraud, breach of contract, and breach of fiduciary duty. (*See* Countercl.) The Third-Party Complaint alleges fraud and breach of fiduciary duty. (*See* Third-Party Compl.) Both pleadings assert that WTEC's lawsuit has caused TSC to lose $230 million in fundraising and $100 million in value. (*See* Countercl. ¶¶ 66–67; Third-Party Compl. ¶¶ 69–70.)

The WTEC Defendants moved to dismiss the Counterclaim and Third-Party Complaint. (*See* WTEC Moving Br., ECF No. 47-1.) TSC opposed (TSC Opp'n, ECF No. 49), and the WTEC Defendants replied. (WTEC Reply, ECF No. 50). The motion is now ripe for consideration.

## II.    LEGAL STANDARD

### A.    Rule 12(b)(6)

Rule 12(b)(6) governs motions to dismiss for "failure to state a claim upon which relief can be granted." To survive a motion to dismiss under Rule 12(b)(6), the complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

The Court conducts a three-step inquiry in evaluating a motion to dismiss under Rule 12(b)(6). *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). First, the Court identifies "the elements a plaintiff must plead to state a claim." *Iqbal*, 556 U.S. at 675. Second, the Court accepts all plaintiff's well-pleaded factual allegations as true and "construe[s] the complaint in the light

most favorable to the plaintiff." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quoting *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)). But the Court disregards "legal conclusions and recitals of the elements of a cause of action supported by mere conclusory statements." *Davis v. Wells Fargo*, 824 F.3d 333, 341 (3d Cir. 2016). Third, the Court considers "whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556 U.S. at 679).

### B.      Rule 9(b)

Under Rule 9(b), claims sounding in fraud must "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); *see Frederico v. Home Depot*, 507 F.3d 188, 200–02 (3d Cir. 2007). Particularity requires sufficient details to put the defendant "on notice of the precise misconduct with which [it is] charged." *Shulman v. Weston*, 816 F. Supp. 3d 495, 507 (D.N.J. 2025) (alteration in original) (quoting *Frederico*, 507 F.3d at 201). At a minimum, Rule 9(b) requires a plaintiff to allege the "essential factual background . . . [in] the first paragraph of any newspaper story—that is, the 'who, what, when, where and how' of the events at issue." *Id.* (alterations in original) (quoting *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 276–77 (3d Cir. 2006)).

### III.     <u>DISCUSSION</u>

### A.      **The Economic Loss Doctrine Bars TSC's Fraud Claim**

The WTEC Defendants argue that TSC's fraud claim fails because, among other reasons, the economic loss doctrine applies. (WTEC Moving Br. at 8–9.) The Court agrees.

The economic loss doctrine "defines the boundary" between tort and contract law "by barring the recovery of purely economic loss in tort, particularly in strict liability and negligence cases." *Calabria Ristorante, Inc. v. Ruggiero Seafood, Inc.*, 706 F. Supp. 3d 489, 498 (D.N.J. 2023)

(quoting *Travelers Indem. Co. v. Dammann & Co., Inc.*, 594 F.3d 238, 244 (3d Cir. 2010)). The doctrine "prohibits plaintiffs from recovering in tort economic losses to which their entitlement flows only from a contract." *Id.* (quoting *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 618 (3d Cir. 1995)). In other words, the economic loss doctrine bars "recovery on a contract claim in tort claim clothing." *Id.* at 499 (quoting *G & F Graphic Servs., Inc. v. Graphic Innovators, Inc.*, 18 F. Supp. 3d 583, 588–89 (D.N.J. 2014)).

The economic loss doctrine applies if "the allegedly tortious conduct is intrinsic to the contract—i.e., where the alleged tort consists of the breach of a contractual promise." *Durr Mech. Constr., Inc. v. PSEG Fossil, LLC*, 516 F. Supp. 3d 407, 418 (D.N.J. 2021) (quoting *CPS MedManagement LLC v. Bergen Reg'l Med. Ctr., L.P.*, 940 F. Supp. 2d 141, 159 (D.N.J. 2013)). The Court, therefore, examines "whether the plaintiff's entitlement to economic losses flows directly from obligations set forth in a contract." *Id.* (quoting *State Cap. Title & Abstract Co. v. Pappas Bus. Servs., LLC*, 646 F. Supp. 2d 668, 678 (D.N.J. 2009)).

With respect to fraud claims,[7] the question is whether the underlying misrepresentations were "extraneous to the contract." *Red Hawk Fire & Sec., LLC v. Siemens Indus. Inc.*, 449 F. Supp. 3d 449, 465 (D.N.J. 2020). Thus, if the plaintiff merely alleges "fraud in the performance of a contract," the economic loss doctrine applies. *Bracco Diagnostics, Inc. v. Bergen Brunswig Drug Co.*, 226 F. Supp. 2d 557, 563 (D.N.J. 2002). But if a party "uses misrepresentations to induce another into entering an agreement," the economic loss doctrine does not apply. *Durr Mech. Constr.*, 516 F. Supp. 3d at 418. In other words, the doctrine will not bar misrepresentations

---

[7] The New Jersey Supreme Court has never formally applied the economic loss doctrine to a fraud claim. *Durr Mech. Constr.*, 516 F. Supp. 3d at 418 n.6. But Courts in this District consistently apply the doctrine to fraud claims, *see id.*, which the Court finds persuasive, *Pre-Settlement Fin., LLC v. Ellis*, No. 18-6339, 2020 WL 5743036, at *5 n.6 (D.N.J. Sept. 24, 2020) (decisions from federal courts applying law of the state in which they are located are worthy of deference (citation omitted)).

"unrelated to the performance of the contract [and] preced[ing] the actual commencement of the agreement." *Chen v. HD Dimension, Corp.*, No. 10-863, 2010 WL 4721514, at *8 (D.N.J. Nov. 15, 2010). However, where a "pre-contractual misrepresentation relates to a defendant's future intent to perform under the contract, it will be considered intrinsic to the contract, and any related fraud claims will be dismissed." *Bergen Beverage Distribs. LCC v. E. Distribs., Inc.*, No. 17-4735, 2022 WL 833373, at *9 (D.N.J. Mar. 21, 2022) (quoting *Petric & Assocs., Inc. v. CCA Civ., Inc.*, 2020 WL 3041418, at *10 (N.J. Super. Ct. App. Div. June 8, 2020)).

Extraneous misrepresentations can include "with[holding] material information regarding the conditions of" a construction project, *Durr Mech. Constr.*, 516 F. Supp. 3d at 419; falsely assuring that a party "carrie[s] standard liability insurance," *Wilhelm Reuss GmbH & Co KG, Lebensmittel Werk v. E. Coast Warehouse & Distrib. Corp.*, No. 16-4370, 2018 WL 3122332, at *5 (D.N.J. June 26, 2018); or lying about having a specific model of printing press for sale, *G & F*, 18 F. Supp. 3d at 586. On the other hand, misrepresenting that a "new project . . . would be developed soon after the agreement" is intrinsic to a contract. *RNC Sys., Inc. v. Modern Tech. Grp., Inc.*, 861 F. Supp. 2d 436, 451–52 (D.N.J. 2012).

The economic loss doctrine bars the TSC's fraud claim because the alleged misrepresentations (1) came after the commencement of the Oral Agreement; and (2) relate to the performance of the Oral Agreement.

First, the Counterclaim and Third-Party Complaint have a timing problem. TSC alleges that "[u]pon entering into the [Oral] Agreement, [the WTEC Defendants] represented to TSC that WTEC would immediately start expanding its existing Florida manufacturing facility and obtain the proper equipment to enable it to strand the TS Core." (Countercl. ¶ 19; Third-Party Compl. ¶ 21.) Thus, it appears TSC claims the WTEC Defendants misrepresented their intent to expand the

8

Florida manufacturing facility *only after* entering the Oral Agreement. Because the purported misrepresentation did not "precede the actual commencement of the agreement," the economic loss doctrine applies. *Chen*, 2010 WL 4721514, at *8.

Second, TSC does not allege any misrepresentations extrinsic to the Oral Agreement. TSC asserts only that the WTEC Defendants falsely promised to "build a new manufacturing facility or expand a current WTEC manufacturing facility with the equipment and capability to strand the TS Core." (Countercl. ¶ 70; Third-Party Compl. ¶ 73.) But this purported misrepresentation relates to the WTEC Defendants' future intent to perform on the Oral Agreement and is intrinsic to the contract. *Bergen Beverage Distribs.*, 2022 WL 833373, at *9. The economic loss doctrine, accordingly, bars TSC's fraud claim. Therefore, Count I of the Counterclaim and Count I of the Third-Party Complaint are **DISMISSED** *without prejudice*.

### B.       TSC Does Not Show WTEC's Breach of Contract Caused a Loss

To state a claim for breach of contract in New Jersey, the plaintiff must show: (1) "the parties entered into a contract containing certain terms"; (2) the plaintiff "did what the contract required them to do"; (3) the "defendants did not do what the contract required them to do"; and (4) the "defendants' breach, or failure to do what the contract required, caused a loss" to the plaintiff. *Globe Motor Co. v. Igdalev*, 225 N.J. 469, 482 (2016) (cleaned up).

TSC alleges that (1) the parties entered an Oral Agreement; (2) TSC performed under the Oral Agreement; (3) WTEC breached the Oral Agreement by failing to expand the Florida facility; and (4) as a result of WTEC's lawsuit, TSC's fundraising has decreased by $230 million, and it has lost $100 million in value. (Countercl. ¶¶ 77–85.)

WTEC argues, among other things,[8] that TSC has not adequately pled damages. The Court agrees. To state a breach of contract claim, the plaintiff must show that the defendant's breach "caused a loss" to the plaintiff. *Globe Motor Co.*, 225 N.J. at 482. The plaintiff must show the loss was "a reasonably certain consequence of the breach although the exact amount of the loss need not be certain." *Donovan v. Bachstadt*, 91 N.J. 434, 445 (1982). The breaching party "is liable for all of the natural and probable consequences of the breach." *Totaro, Duffy, Cannova & Co., L.L.C. v. Lane, Middleton & Co., L.L.C.*, 191 N.J. 1, 13 (2007) (quoting *Pickett v. Lloyd's*, 131 N.J. 457, 474 (1993)). Damages flowing from a breach of contract "must be reasonable, certain and not speculative." *Westrich v. McBride*, 204 N.J. Super. 550, 557 (Law. Div. 1984).

TSC does not identify any loss stemming from WTEC's breach of the Oral Agreement. (*See generally* Countercl.) Rather, the Counterclaim alleges a precipitous decline in TSC's fundraising and economic value due to WTEC's *lawsuit*. TSC does not claim that WTEC's lawsuit breached the Oral Agreement. Nor can the Court readily infer that WTEC's breach of the Oral

---

[8] WTEC further asserts that the build-a-facility provision of the Oral Agreement was a condition precedent, meaning WTEC's failure to expand the Florida facility did not breach the Oral Agreement. The Court disagrees.

A condition precedent is an event "which must occur . . . before performance under a contract becomes due." Restatement (Second) of Contracts § 224 (1981). "Generally, no liability can arise on a promise subject to a condition precedent until the condition is met." *Duff v. Trenton Beverage Co.*, 4 N.J. 595, 604 (1950). Accordingly, "a contracting party's failure to fulfill a condition . . . is not, without an independent promise to perform the condition, a breach of contract." *In re Columbia Gas Sys. Inc.*, 50 F.3d 233, 241 (3d Cir. 1995) (citation omitted). Yet, because a condition precedent create forfeiture, the condition "must be expressed in clear language or it will be construed as a promise." *Liberty Mut. Ins. Co. v. President Container, Inc.*, 297 N.J. Super. 24, 34 (App. Div. 1997) (quoting *Castle v. Cohen*, 840 F.2d 173, 177 (3d Cir. 1988)). "Thus, where the contract language is unclear, an obligation should be interpreted as a promise, rather than a condition precedent." *Marsa v. Metrobank for Sav., F.S.B.*, 825 F. Supp. 658, 664 (D.N.J. 1993), *aff'd sub nom. Marsa v. Metrobank Fin. Grp., Inc.*, 26 F.3d 122 (3d Cir. 1994).

Here, the Court cannot unambiguously construe the parties' agreement for WTEC to build or expand a stranding facility as a condition precedent rather than a promise. Rather, TSC alleges the assurance to build a facility was, itself, a promise. (*See* Countercl. ¶¶ 19–22.) And, because the precise metes and bounds of the Oral Agreement are fact sensitive, the question of whether a term was a condition precedent should not be resolved at this early stage. And, even if the build-a-facility term was a condition precedent, TSC alleges the WTEC Defendants made "an independent promise to perform the condition" by expanding WTEC's Florida facility, potentially giving rise to breach of contract. *Columbia Gas*, 50 F.3d at 241.

Agreement caused WTEC to sue TSC, which in turn caused TSC to lose fundraising and value. Because TSC does not show WTEC's breach caused a loss, TSC fails to state a breach of contract claim upon which relief can be granted.

Accordingly, Count II of the Counterclaim is **DISMISSED** *without prejudice*.

### C.      Breach of Fiduciary Duty

TSC denies a partnership or joint venture existed between TSC and WTEC, but asserts that, if a partnership or joint venture did exist, the WTEC Defendants breached their fiduciary duties to TSC. (*See* Countercl. ¶ 87; Third-Party Compl. ¶ 81.) The Court declines to revisit its earlier holding that WTEC adequately alleged a joint venture with TSC. *Saint-Jean v. Palisades Interstate Park Comm'n*, 49 F.4th 830, 836 (3d Cir. 2022) ("[A] rule of law announced in a case should later be applied to 'the same issues in subsequent stages in the litigation.'" (citation omitted)). The Court, accordingly, considers whether TSC adequately states a claim for breach of fiduciary duty.

To state a claim for breach of fiduciary duty, "[a] plaintiff must prove (1) the parties had a fiduciary relationship, (2) the defendant breached a fiduciary duty owed to the plaintiff, (3) proximate cause, and (4) actual damages." *Tuzzeo v. Steele*, 2025 WL 1734023, at *4 (N.J. Super. Ct. App. Div. June 23, 2025) (citations omitted). A fiduciary relationship "arises between two persons when one person is under a duty to act for or give advice for the benefit of another on matters within the scope of their relationship." *Hornor v. Upper Freehold Reg'l Bd. of Educ.*, 263 N.J. 120, 163 (2026) (quoting *F.G. v. MacDonell*, 150 N.J. 550, 563 (1997)). A fiduciary owes a "duty of loyalty and a duty to exercise reasonable skill and care." *F.G.*, 150 N.J. at 564.

TSC adequately alleges the existence of a fiduciary relationship. There is "no question that joint venturers owe each other a fiduciary duty." *Read v. Profeta*, 397 F. Supp. 3d 597, 633 (D.N.J.

2019) (quoting *Lo Bosco v. Kure Eng'g*, 891 F. Supp. 1020, 1033 (D.N.J. 1995)). And TSC plausibly alleges the WTEC Defendants breached their duties of loyalty and care in not taking any steps to expand WTEC's Florida facility or disclosing that fact to TSC.

But, as before, TSC fails to establish proximate cause. Proximate cause means "any cause which in the natural and continuous sequence, unbroken by an efficient intervening cause, produces the result complained of and without which the result would not have occurred." *Townsend v. Pierre*, 221 N.J. 36, 51 (2015) (quoting *Conklin v. Hannoch Weisman*, 145 N.J. 395, 418 (1996)). Here, the Counterclaim and Third-Party Complaint identify only TSC's $230 million fundraising decrease and $100 million loss in value as damages. (Countercl. ¶¶ 66–67; Third-Party Compl. ¶¶ 69–70.) But TSC alleges WTEC's *lawsuit*, not the breach of a fiduciary duty, caused those damages. (Countercl. ¶¶ 66–67; Third-Party Compl. ¶¶ 69–70.) The Court cannot conclude that WTEC's breach of its fiduciary duties caused it to sue TSC, which in turn caused TSC to lose fundraising and value. Nor has TSC alleged that WTEC's lawsuit, by and of itself, breached WTEC's fiduciary duty to TSC.[9] Because TSC does not adequately allege that the WTEC Defendants' breaches caused actual damages, Count III of the Counterclaim and Count II of the Third-Party Complaint are **DISMISSED** *without prejudice*.

---

[9] In its opposition brief, TSC argues it suffered damages by fundraising, building a factory, and manufacturing the TS Core on its own, without WTEC's help. (TSC Opp'n at 5–6.) But neither the Counterclaim nor the Third-Party Complaint expressly identify those as damages. (*See* Countercl.; Third-Party Compl.) A party cannot use their briefs to amend their pleadings. *See Olson v. Ako*, 724 F. App'x 160, 166 (3d Cir. 2018).

## IV.    CONCLUSION

For the foregoing reasons, the WTEC Defendants' motion to dismiss (ECF No. 47) is

**GRANTED**. An appropriate Order accompanies this Opinion.


**DATED:** 6/29/2026

_____
**JULIEN XAVIER NEALS**
**United States District Judge**